## DONNELL v. C. R. DISHAROON CO.

Circuit Court of Appeals, Fourth Circuit.
April 11, 1929.

No. 2820.

Aubrey R. Bowles, Jr., of Richmond, Va. for appellant.

William L. Rawls, of Baltimore, Md. (F. Leonard Wailes, of Salisbury, Md., on the brief), for appellee.

Before WADDILL and PARKER, Circuit Judges, and McDOWELL, District Judge.

McDOWELL, District Judge. The court below after hearing the evidence dismissed the plaintiff's bill, with costs to the defendant. The appellant was the plaintiff below.

In the spring of 1927, the C. R. Disharoon

Company owned a freight-carrying motorboat, known as the Morning Light, for which the company had no use and which the company was quite anxious to sell. The appellant at that time was in need of a boat for river freight service, which could be legally operated by an unlicensed pilot. Such a boat had to be one classified by law as a motorboat. By a federal statute, in force since 1910, no vessel propelled by machinery (except tugboats and towboats) is a motorboat if it exceeds 65 feet in length "measured from end to end over the deck, excluding sheer." Section 1, Act June 9, 1910, c. 268 (36 Stats. 462, 46 USCA § 511). By section 5 of this statute (46 USCA § 515) motor boats, if not engaged in carrying passengers for hire, need not have any licensed officer aboard.

Having heard that the Disharoon Company had a motorboat for sale, Donnell wrote to the company on April 2, 1927, asking if they had a boat for sale, and asking for a description and for the price. The letter reads in part: "* * * Let me have a full description of the boat as to length, beam, condition of hull and power plant. * * *" The answer to this reads in part: "* * * We think she is 60' long, 23' wide and draws 5¾' loaded."

Early in May, Donnell went to Salisbury, met the vice president of the company, W. R. Disharoon, and went aboard the Morning Light, then lying at the dock. In their first conversation, Donnell says that he told Disharoon what he wanted to do with the boat and asked him if she was under 65 feet in length, or in the motorboat class, and that Disharoon said she was. Thereafter, Donnell having again brought up the matter of the length of the boat, and one Drummond, the then pilot of the boat, having joined the other two, they went into the pilot house and looked at the enrollment-license of the boat. See 46 USCA §§ 259, 260. This document, dated September 4, 1919, showed the registered length of the boat as 67.8 feet. And thereupon Disharoon told Donnell that the boat had been in a wreck since that measurement had been made and that her length had been reduced. Donnell's evidence is as follows:

"We went in the pilot house and Captain Drummond looked up the papers and we found that they showed 67.8, I believe, and I said at that time, 'Well, I could not use the boat because she was in excess of 65 feet.' Mr. Drummond says, 'Those papers, or those figures, is not correct.' The boat has been cut down. I believe Mr. Disharoon said the boat had been cut down and Captain Drummond said that the boat was 59 feet long, and

with that I didn't think anything more about the length of the boat. I naturally thought that the owner and master of the vessel would know the boat's length and I accepted it as a fact.

"Captain Drummond told me, in connection with our conversation about the length of this boat, that an inspector had been aboard of her at one time and raised the question about her not being a motorboat, and that he and this inspector had made a trip to a custom house—I do not know that he said where, but, as I recall it, it was Crisfield, or at least I thought it was Crisfield, from the nature of the conversation, and that he satisfied the inspector that she was in the motor boat class."

An undated letter, written probably about June 1, 1927, from Donnell to Disharoon, reads as follows: "When application was made for insurance on the Morning Light it appears that she is yet carried under the old registry as a gas boat of 67 feet 9 inches. It was my understanding that you had the boat cut down and that she is slightly under 60 feet. If this is correct no doubt you have had the necessary records made with the custom's officer at point she is registered, if not I would be obliged to you to look after this at once and let me have the necessary documents to cover the change in order that I may furnish the insurance people with correct data on the boat and at the same time have the proper papers to cover her operation."

In response, Disharoon wrote on June 6th to the company which had made the repairs after the wreck, which occurred in 1921 or 1922, as follows: "We have sold the Morning Light to a party in West Point and we told him that at the time of putting in the new bow that we were under the impression the boat had been shortened. She is registered as 67'9", and we think that she is shorter than this at present. If you have any way of telling, will you please advise and we will have the registry changed as this is what the party desires on account of carrying some insurance on the boat."

Disharoon's next letter, dated June 13th, was to Donnell, as follows:

"We have heard from the White Haven Ship Building Company at White Haven, Maryland and they state that they have no record of making any change in the Morning Light while there. This is nothing but a small shipbuilding concern and probably does not keep very many records, so we hardly know what to suggest in the matter except just simply to wait until you have to haul the boat out, then she can be measured at that time.

"We trust that you have gotten the boat in operation and that she is doing alright."

The next letter, June 16th, was from Donnell to Disharoon, which reads in part:

"Your favor of the 13th came the morning following my wire regarding the length of the Morning Light.

"I regret to advise you that on account of the boat being over 65 feet in length that I cannot operate her without licensed crew of two men. On the strength of what you and Captain Drummond said about her length and etc., I put her on the run without investigating this feature closely and as I wrote you before in trying to obtain insurance on her it developed that she has not been cut down, or at least there is no record of it."

Disharoon testified in part as follows: "With reference to whether I led Mr. Donnell to believe that this boat had been previously cut down in order to bring it within the 65 feet, I did not do that or say that at all. The fact of the matter is when she was cut down I did not know she was cut down until after it was done. She was in this wreck and she was taken to White Haven to be repaired, and I understood afterwards when they cut into her bow they found it pretty well decayed, and they cut her down to a certain extent, and then when I heard from Mr. Donnell to verify this cutting down process, I took it up with Mr. Anderson at White Haven, owner of the shipyards, thinking that he could remember something about it and he wrote back that he did not have any records and did not remember whether he did cut her down or not."

And again: "I discussed with Mr. Donnell when he first arrived in Salisbury the purpose for which he was going to use the boat. He told me what he wanted it for."

Drummond testified for the defendant, but he makes no denial of the fact that Disharoon told Donnell that the boat had been shortened since the measurement shown on the license was made.

The measurements set out in the license were in fact tonnage measurements, and the length stated (67.8 feet) was at least slightly less than the length measured over the deck. But it seems an unquestionable fact that at the time that Disharoon said that the boat had been shortened both he and Donnell believed that the measurements set out in the license were the measurements which controlled in respect to the classification of the Morning Light as a lawful motorboat.

After much consideration of the evidence, we are thoroughly satisfied that Disharoon did say to Donnell that the boat had been shortened since 1919 so as to make her length less than 65 feet, and that this statement was untrue. It was certainly highly material. We are also entirely satisfied that it was made in order to induce Donnell to purchase the boat, and that Donnell relied on it, and that he would not have made the contract of purchase except for this untrue statement. Whether Disharoon made the statement knowing it to be untrue, or merely without knowing whether it was or was not true is unimportant. 2 Pomeroy Eq. Juris. (2d Ed.) § 877; 26 Corpus Juris, 1109; 12 R. C. L. 335, 336, §§ 92, 93. In Kell v. Trenchard (C. C. A. 4) 142 F. 16, 23, it is said: "The law is well settled that a false representation by a vendor of a material fact constituting an inducement to the contract of purchase, and on which the purchaser had the right to rely, is a ground for the rescission of his contract by a court of equity, and that, too, though the party making the representation may have been ignorant as to whether it was true or false; the real inquiry being not whether the vendor knew the representation to be false, but whether the vendee believed it to be true, and was misled by it in entering into the contract. M'Ferran v. Taylor, 3 Cranch, 270, 2 L. Ed. 436; Rose's Notes, vol. 1, p. 238, and cases cited; Smith v. Richards, 13 Pet. 26, 10 L. Ed. 42; Grim v. Byrd, 32 Grat. (Va.) 300; McMullin's Adm'r v. Sanders, 79 Va. 365; Wren v. Moncure, 95 Va. 369, 28 S. E. 588."

It is a fact that there is not in the record any express statement by any witness that the length of the boat, as shown by the license issued in 1919, was not reduced in 1921 or 1922. But that it was not is implied throughout the testimony of both Donnell and Disharoon. Moreover, there is a presumption that there has been no change of build of the boat since 1919. By section 4319, R. S. (46 USCA § 259), the enrollment had to show certain dimensions of every enrolled vessel, including its length. By section 4324, R. S. (46 USCA § 266), no license remained in force any longer than the vessel is owned by the person and is of the description set forth in such license. By Act of April 24, 1906, c. 1865 (34 Stats. 136, 46 USCA § 267), enrollments and licenses were consolidated, and it is provided that, "in case of change of build or ownership" (inter alia), the license shall be surrendered. And for a failure to surrender the license in such event a penalty of $10 is imposed on the master. As has been said, the combined enrollment and license of the Morning Light, in the pilot house when seen by Donnell, had

been issued in 1919. If the boat's length had been shortened several feet in 1921 or 1922, there had been a change of build and the then master of the vessel had violated a penal law in failing to surrender the license issued in 1919. The presumption of right doing and the presumption of innocence put on the defendant a burden of introducing some evidence tending to overcome the presumption that the length of the boat had not been reduced since 1919, and that Disharoon's statement was untrue. No such evidence was offered.

It is contended that Donnell was negligent, in that he did not himself measure the boat, before agreeing to buy her. The following is from the testimony of an assistant inspector, a disinterested witness, concerning the seeming length of the Morning Light: "As to my impression from the appearance of the boat whether she was as long as she actually proved to be, I would say that is hard to tell. That is only a guess, to just stand and look at her, but to just stand and look at her, I did not think she was a boat that long, for the reason that she is a very beamy boat. I think I said to Mr. Donnell, if I am not mistaken, that she did not look to be much over 65 feet, if that."

We are entirely satisfied that Donnell had a right to rely on Disharoon's explanation of the discrepancy between his statement that the boat was not over 65 feet long and the length shown on the license.

We think the bill, inartificially but sufficiently, alleged the facts giving Donnell a right to rescission for fraud. See Equity Rule 19. We also are of opinion that the plaintiff below introduced evidence which gave him a right to relief. It follows that we need not discuss other reasons for reversing the decree below which have been asserted here by the counsel for Donnell. The decree below must be reversed, with costs here and below to the appellant.

Reversed.

PARKER, Circuit Judge, concurs in the result.